So, Ms. Dixon, you're first in the case of Araujo v. Garland. So, please proceed, Ms. Dixon. Thank you. I'm Allison Dixon and I represent Mr. Araujo. One of the main issues in this case is the credibility of my client. But the lack of credibility finding is in violation of STRESA, which allows the totality of circumstances and the rule of reason in these proceedings. So, normally credibility is determined by demeanor, plausibility of the account, and inconsistency. Here, demeanor and plausibility of account are not at issue. So, it's merely a question of inconsistency in testimony. But several things are not at issue. One is that Mr. Araujo is in fact a journalist, that he publicly has criticized the government and the cartels and alleges that they are working in collusion. He's had radio shows for about 30 years now. This radio show is heard both in Mexico and the United States. And the majority of the calls that he receives do come from Mexico. On this radio show, he again talks about the government collusion with the cartels. There's also no, or it's accepted that his brother was murdered. A witness that we were going to have to come testify regarding the death of the brother and other instances, Mr. Gonzales was murdered a week before he was to come to the United States and testify. Let me ask you this, counsel. You're arguing what your brief said, of course, and I understand that. But what stands out to me here is that your client specifically indicated that he was not harmed, not threatened, and then in the later iteration, he said that the police tried to murder him. That's a pretty startling distinction. That showed up on a couple of occasions. We get a lot of these cases that deal with credibility, but few of them that have this basically gap, huge gap. What's your best response to the IJ and the BIA's determination that he just can't be right when he said everything was fine there, and then the other one that he was going to be murdered by the police? Yes. Well, first of all, those incidents happened over 30 years ago, and many, many things had happened between then and when he testified. Secondly, when he... He's going to remember if somebody tries to murder him, I assume. Yes. But what we have is we have PTSD on his, and we also have neurological functioning problems. What we also have is when he gave a lot of these statements, he was in custody. He is diabetic. The diabetes was not treated. He only has one eye, and as a result of the lack of treatment, the one eye he had had severe retinopathy. So, given those circumstances, it's understandable that he would make a mistake like this. Well, but with respect, there are mistakes, and there are complete differences. He was asked specifically whether he was harmed in Mexico. He basically said that neither he nor his immediate family was harmed, and then later on, he says that the police tried to murder him. Now, I respect the fact that PTSD could be an issue, so can diabetes and so on. These are diametrically opposed statements, and what in the record compels the conclusion that your client was credible versus the determination by the eye, which of course is your burden to show? Yes. Well, again, what we have is neurological memory problems based on the diabetes and other things that he has in his background. So, that would explain why it is that he would say one thing and then say another thing differently. And the judges in this case basically substituted their opinion versus what the opinion of the doctors were, which said that these memory lapses are severe and that that would explain why he has different stories. There's also the difference between being in custody and under that type of stress versus being out of custody, which makes a huge difference. Go ahead. The expert testimony? I'm sorry? Is there a law that the IJ has to accept the expert testimony rather than making a credibility determination of his own? Well, no, there's no law that says that, but he can't just overlook the medical expert testimony and say that, oh, I believe he should have remembered this, when in fact there may be reasons why he didn't make those statements. Counsel, can I? I think Judge Smith's questions went to these inconsistencies, right? And that seems like a big inconsistency, as the judge was mentioning, but there's another issue that I'm struggling with, which is your explanation for the inconsistency is that when he was having diabetes problems and PTSD, but at some point he said, this is what happened. I was, police tried to murder me. Of course, the IJ asked him about that, and what I find difficult about your explanation of the difference is that his answer to the IJ, when the IJ asked him when he first initially brought this up, not at the first hearing with the hearing officer and not in his declaration, but when he brought it up at the IJ hearing, the IJ said, well, why are you bringing this up now? Why didn't you bring it up earlier? And he didn't give the reason that you're giving, which would be kind of, you know, at that point, he's obviously has now remembered under your theory that he's not being inconsistent. But I think your theory would have to be that he had now at this point remembered what he had, that he had been almost murdered, but that he didn't know why he had remembered. Because later on, you see what I'm saying? The initial reason that he gave had nothing to do, I think his answer was, I just, I just included those things off the top of my head that I felt were most important. And it wasn't until years later that that he actually said, well, it was because of my diabetes and PTSD. Well, what he did say in the courtroom when asked about that is that he did have problems with the diabetes and the memory that that was clear in the testimony that he gave in front of the first immigration judge. So he did acknowledge that. That was the explanation, because I didn't understand that that was the explanation. My understanding was that initially, the explanation that he gave was that I only included those things that I thought were important. And he also said that he had the problems with his memory in the same hearing. Was that elsewhere in the same hearing or was that in response to this question? It was in response to that question from the judge. It was elsewhere in the same hearing. At bottom, you've got a situation here where the IJ has made a determination, a credibility determination. And as you know, as capable counsel, it's your burden to show that the record compels a conclusion that the IJ was wrong. Other than what you've already said, what can you point to in the record that compels such a conclusion? Well, because the judges also accepted a lot of what he said as true, that he is a journalist, that he is publicly known in Mexico, and that he has been very critical of the government on the radio show, which continues to this day. And at this point, I would like to reserve if I could. Please do so. Very well. Let's hear from the government, Mr. Robbins. May it please the court. My name is Jonathan Robbins. I'm here on behalf of Merrick Garland, the attorney general and respondent in this matter.  Good morning. The issue before the court today is whether the record compels reversal of the agency's denial of petitioner's applications for withholding of removal and protection under the regulations implementing the Convention Against Torture. And as your honors have already alluded to, an analysis of that requires looking at the agency's adverse credibility finding. Now, there is certainly substantial evidence in this record to support the adverse credibility finding. As your honors have already pointed out, there is a major embellishment in the claim where petitioner at first claimed that he had only received threats and nothing else had happened to him, and then later claimed that he was the target of an attempted murder. There's also an embellishment with respect to his story regarding his brother, who had been in an argument with the mayor of a town named Valencia. He initially claimed that Valencia had threatened his brother, but then later embellished the claim and claimed that he too was threatened during that encounter. Now, those embellishments are significant because they enhance the nature of his claim. And because I don't think there's really much dispute that those embellishments are present in the record, that does constitute substantial evidence that supports the agency's adverse credibility finding. So, I mean, at the end of the day, I think your honors have it correct here. If you're coming to the United States asking for protection under United States refugee law, and you don't mention that you've been the target of an attempted murder, any reasonable fact finder is reasonably going to raise an eyebrow at the veracity of the claim, or at least wonder whether the claim is being embellished. And so, because that is in the record and it's not really disputed that that's in the record, the petition for review should be denied. Now, my colleague has mentioned that the IJ did credit certain portions of the claim, that it's not disputed. Petitioners, journalists, and other things of that nature. And that's true. But the nature of an adverse credibility claim is oftentimes mixed. It is truth mixed with things that are either embellishments or fiction. So, the fact that the IJ may have credited certain portions of the claim doesn't shed doubt on the reliability of the immigration judge's credibility claim. I mean, very often claims are partly true and partly fiction. And there was nothing in error with the immigration judge finding in this case that the claim had been embellished. Counsel, can I ask a follow-up to what I was asking your opposing counsel, which is my understanding, and I'm looking at the record here, and I think my understanding is correct. But when the petitioner first brought this up, the assassination attempt slash murder attempt, you know, he describes it, I think, in the record to the IJ. And then he's asked, why didn't you, in your written statement, there's nothing about this, why didn't you include it? And I think his answer was what I said earlier, which was, I just included what I thought was important off the top of my head. Which is, which I have a little trouble thinking, I would think that having almost been murdered would be. But I think if I understood your, this is at AR 671 and 72, but as I understand your opposing counsel, which I did not understand to be true, that she says that he also, at that time, said, oh, and I have diabetes or PTSD or gave some of it. But I don't, I'm not seeing that. Do you know, can you tell me whether or not at that time he gave that response? Well, his initial response, you're right, was at page 672, where he claimed that he only included things to be most important. Now, later on in the testimony, on page 936, he claimed that when he prepared the declaration, he was, quote, not well organized. And he did say at that time that he had problems with things like pressure and diabetes. Now, my colleague has, just to be clear, is that the same hearing? That's like hundreds of pages different, but that's the same hearing later in the same hearing? I'm not, I'm not sure. Let me check. 936, the date on page 936, which is where he said the thing about diabetes is, that was February 3rd of 2012. So that does appear to be the initial hearing. So that, and that is the same. Oh, no, I'm sorry. The hearing was split up over multiple dates. The other, the page 672 was the hearing that took place on April 14th of 2010. So it looks like it was separate hearings. So six, so he, now those were all the hearings from underlying proceedings and not the most recent one that was on remand. That was not the new hearing that doubled the interpol notice. But it was, but it was in the separate hearings in the prior proceedings. Okay. Thank you. Just to make sure I understand your answer to Judge Van Dyke's question. Yes. The reference to not being organized and having diabetes occurred at a hearing other than the one in which he first was confronted by the IJ about the difference of stating and not stating that he was almost murdered. Is that correct? Yes. At the 2010 hearing when he was confronted, he initially said that he put the things that he thought were most important. Then at the 2012 hearing that shifted and it said he claimed that he wasn't well organized and had pressure and diabetes. Now, my colleague has suggested that the immigration judge didn't give a proper consideration to the medical diagnosis regarding diabetes and PTSD. But I think that claim should be belied by the record. The immigration judge actually issued a separate memorandum specifically to deal with this new evidence. So to suggest that the immigration judge didn't consider it, I think is not plausible reading of the record. Now, I just want to briefly with my remaining time focus a little bit on the issue that didn't come up in the opening presentation, but that I think is important regarding the interpol notice. Because that is, of course, the reason that petitioner finds himself back in proceedings. Back when we first argued this case several years ago, we remanded this case in the, you may recall under that time there was a prosecutorial discretion initiative under some executive memos and the agency determined that it would be appropriate to close this case. Of course, now we have this interpol notice and that's the reason that he's back in proceedings. And the immigration judge did give proper consideration to that notice. The immigration judge, I think, correctly assessed that the notice did put him at some risk for his torture claim because the evidence does suggest, or not suggest, the evidence does demonstrate that Mexico uses torture to, the police and military do often extract confessions using torture. But I think the immigration judge also reasonably determined that the evidence wasn't sufficient to meet the burden of proof in this case because there was nothing in the evidence to help quantify what likelihood of torture petitioner might face. And, of course, I'm sure your honors know that when a claim is based really on a speculative assertion of a likelihood of harm, it's going to be very difficult to meet the burden of proof in a case like that. And I will also note that petitioner, unlike other claims where people have been able to establish the burden of proof in CAT claims, petitioner has not established that he's credibly undergone any past harm. He's been in the United States for many, many years. To the extent that he suggested that the interpol notice was politically motivated, the immigration judge pointed out that that didn't really make sense because the notice itself predated his current political activity. And I will also note that he supported President Obrador, who is currently the government in Mexico, so that would seem to mitigate any potential likelihood of torture based on his political activities. So I see that my time is running low. If your honors have any specific questions about the issues, I'm happy to answer them. Otherwise, the government would respectfully ask that the petition for review be denied. Any questions by my colleagues? I'm hearing none. Thank you, Mr. Robbins. So, Ms. Dixon, you have a little rebuttal time. Yes, I do. Thank you. While we are looking at substantial evidence, substantial evidence is not blind and we need to look at the evidence. And again, what we have here is while the IJ did discuss the medical issues, he basically gave them no weight and substituted his own opinion in for the medical experts as well as the testimony of my client. With respect, I think what happened was he considered the medical evidence and concluded that it didn't affect his judgment with respect to a failure to mention the murder versus not mentioning anything before. That's different than totally discounting, just saying it didn't explain that. Yes. That's what judges do. They have to judge. Exactly. But in this case, I think the evidence was very compelling that he had significant memory problems. With respect to the CAT claim and the lack of quantifying, we're only looking at preponderance of evidence. So, we're looking at is it likely true. And in this case, the… You say we're only looking at preponderance, but that's 51 percent. But it's not that high. But what the judge did agree is that torture is widespread in Mexico and that he is at a higher risk for being tortured. And she just wanted to have some sort of percentage based on how many people were tortured versus the population or things of that nature. But widespread, it means exactly that it happens all the time. So, therefore, that would meet the threshold of the 51 percent without any issue. Because widespread… I think your time is up. Let me ask my colleagues whether either has additional questions for Ms. Dixon. I think not. So, Ms. Dixon, thank you and thank Mr. Robbins for your argument in this case. Thank you. The case of Araujo versus Garland is submitted.
judges: Schroeder, M. Smith, Vandyke